1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
7                                AT SEATTLE

8    LOVETT JAMES CHAMBERS,                    CASE NO. C18-541-JCC-JPD

9                         Petitioner,          REPORT AND RECOMMENDATION

10          v.

11   RON HAYNES,

12                        Respondent.

13

14              I.       INTRODUCTION AND SUMMARY CONCLUSION

15          Petitioner, a state prisoner who is currently confined at the Stafford Creek Corrections

16   Center in Aberdeen, Washington, seeks relief under 28 U.S.C. § 2254 from a 2014 King County

17   Superior Court judgment and sentence for one count of manslaughter in the first degree while

18   armed with a deadly weapon following a seven-week jury trial.  Dkt. 14, Ex. 1 (*State v.*

19   *Chambers*, King County Cause No. 12-1-00939-9 SEA).  Respondent has filed an answer to

20   petitioner's habeas petition, Dkt. 20, and submitted relevant portions of the state court record.

21   Dkt. 14.  Petitioner has filed a reply to respondent's answer.  Dkt. 21.

22

23

REPORT AND RECOMMENDATION - 1

Having considered the parties' submissions, the governing law, and the balance of the record, the Court recommends that petitioner's federal habeas petition, Dkt. 6, be DENIED, that a Certificate of Appealability be DENIED, and this case be DISMISSED with prejudice.

## II.    BACKGROUND

### A.    Factual History

The Washington State Court of Appeals ("Court of Appeals"), on direct appeal, summarized the facts relevant to petitioner's conviction in approximately twenty pages. Dkt. 14, Ex. 2 (*State v. Chambers,* Court of Appeals Cause No. 72093-7-I). Specifically, the state court noted that between 1966 and 1989, petitioner had previously served time in both the state and federal prison systems for several felony convictions. *Id*. at 2. Following his release from prison in 1989, he moved to Washington, where he eventually started an IT company. *Id*. Despite his criminal history, petitioner regularly carried a .45 caliber semiautomatic handgun, purchased by his wife, who did not know of petitioner's prior convictions. *Id*. Petitioner would often drink at the Feedback Lounge, which is a bar located about one mile from his house. *Id*. at 2-3. Petitioner would keep the gun in his car when drinking at the Feedback Lounge. *Id*. at 6.

Petitioner was at the Feedback Lounge on January 21, 2012. *Id*. at 3. He had been at the bar for approximately five hours, during which time he had several vodka martinis and a shot of vodka. *Id*. Jonathan Vause and Michael Hood, two Caucasian men, were also at the Feedback Lounge that night. *Id*. The two men had smoked marijuana and had a beer or two prior to arriving at the Feedback Lounge. *Id*. Vause and Hood went to the back area of the crowded bar, where they had some food and beer. *Id*. at 4. Petitioner, Vause, and Hood all coincidentally left the Feedback Lounge at approximately the same time. *Id*. As he was leaving, Vause noticed petitioner near the front door, and mistakenly thought petitioner, who is a 6'3" and 225 lbs. African-American male, was working as security for the bar. *Id*.

After leaving the bar, Vause and Hood walked toward their truck.  *Id*.  Because of the cold and windy weather, Vause walked fast and did not wait for Hood, who was slightly behind Vause.  *Id*.  Vause unlocked the door, got into the driver's seat, and waited for Hood.  *Id*.  Vause could see somewhat down the sidewalk, but not all the way to the Feedback Lounge.  *Id*.  A few seconds later, Vause saw Hood walking up the sidewalk with petitioner walking about six to eight feet behind him.  *Id*. at 5.  Hood reached the truck, opened the passenger-side door, pulled out a shovel, and held it like a baseball bat in a batter's stance.  *Id*.  Petitioner jumped back a few steps until he was about nine to ten feet from Hood.  *Id*.  Hood then yelled that petitioner had a gun, and tried to get into the truck.  *Id*.  Vause heard a shot and saw a flash as he got out of the truck and crouched down, hiding behind the bed of his truck.  *Id*.  Petitioner fired two more shots.  *Id*.  Petitioner then put the gun inside his jacket, and casually walked back toward the Feedback Lounge.  *Id*.  Vause pulled Hood into the truck, and drove to get medical help.  *Id*.  Hood eventually died at the hospital from the gunshot wounds to the back.  *Id*. at 6.

Meanwhile, petitioner walked to his BMW and drove home.  *Id*. at 5.  Several witnesses called 911 and reported the shooting.  *Id*.  An employee of the Feedback Lounge told police that a person matching the description of the shooter had been in the bar, and the employee gave the police a credit card receipt with petitioner's name on it.  *Id*. at 5. When police arrested petitioner at his home later that night, petitioner smelled of alcohol, was "swaying," had trouble balancing, slurred his words, and was argumentative.  *Id*. at 6.  A blood draw showed petitioner had an alcohol level of .20 grams per 100 milliliters, or about 8.7 drinks, at the time of the blood draw.  *Id*. at 15.  Officers obtained a search warrant, and found a loaded .45 caliber handgun in petitioner's home.  *Id*. at 6.

Although petitioner was advised of his *Miranda* rights, petitioner waived his rights and agreed to talk to detectives.  *Id*. at 6.  The recorded interview lasted about one hour.  *Id*.  Before the interview began, petitioner shook his head and said, "'Goddamn. Fuck. Um! Goddamn! What the fuck. Goddamn! ... Ah, Fuck. What the fuck happened?'"  *Id*.  During the interview, petitioner

initially asked detectives, "Tell me what happened, man." *Id.*  He initially denied having "any trouble" with anyone before getting into his car, and denied knowing what had happened.  *Id.* at 6-7.  When the detective told petitioner that there was no question that he had shot Hood, he at first denied interacting with Hood that night.  *Id.* at 7.  However, petitioner then told the detectives, "'I remember now! . . . They were fucking with me.'"  *Id.*  Petitioner said that the two men were "trailing" him, "talking shit" and saying racial things to him.  *Id.*  Petitioner at first said that he shot Hood when the two men were trying to get into his car to attack him.  *Id.*  But he changed the story after detectives said the shooting did not occur at the car, stating that he did not remember getting out of his car or what happened afterward.  *Id.* at 8.  When the detectives told petitioner he could not have fired the gun near his car because the bullet casings were found on the sidewalk down the street, petitioner said he got out of his car because the men were trying to get in.  *Id.*  Petitioner said he thought the men might have a weapon, although he did not see one, and he did not remember grabbing his own gun.  *Id.* at 8-9.  When detectives later examined petitioner's BMW vehicle, they found no sign of any attempt to enter the passenger side door.  *Id.* at 9 ("Detective Tim Devore looked specifically for 'signs, indications of an attack that occurred at the passenger side of the vehicle.'  Detective Devore "found no scratches or rubs, marks, or fingerprints.'").

The prosecution charged petitioner with second-degree felony murder based upon the underlying felony of second-degree assault.  *Id.* at 9.  Petitioner claimed self-defense.  *Id.*  During the seven-week trial, the prosecution presented testimony from Vause, employees of the Feedback Lounge, witnesses to the shooting, a Washington State Patrol firearm expert, a toxicologist, and the detectives.  *Id.* at 10.  The bartender at the Feedback Lounge testified that petitioner was a regular, but was drinking more than usual the night of the shooting.  *Id.* at 10.  A server at the bar agreed that petitioner had more to drink than usual, and also testified that Vause and Hood were polite, and not obnoxious while at the bar.  *Id.* at 10-11.

Vause testified that when he and Hood left the Feedback Lounge, they called each other a variation of a racist slang term, "nigga," that they had commonly used growing up in the South that they felt meant the same as "dude" or "homeboy." *Id.* at 11. Vause said he and Hood (who were both white) did not use the word "nigger," which Vause testified is a racist word. *Id.* at 11. Vause testified that as he sat in the truck, he saw Hood walked to their truck in his "normal . . . strolled slow style," when Hood appeared to say something to petitioner. *Id.* at 12. Vause said Hood did not appear to be angry, and his body language did not show any tension or aggression. *Id.* However, when Hood reached the truck, he opened the door, took out a shovel from the back of the truck, and held it like a baseball bat in a batter's stance. *Id.* Hood said something to petitioner, at which point petitioner pulled his gun and shot Hood. *Id.* at 12-13.

The medical examiner testified that Hood died of multiple gunshot wounds, including gunshots to his chest, upper back, and lower back. *Id.* at 14. The medical examiner could not determine the order of the gunshots, but the medical examiner testified that the angle of the gunshot to the chest indicated that Hood was not facing the shooter at the time. *Id.* The medical examiner testified the two shots to the back were "'straight on from the back.'" *Id.* at 15. The firearm expert testified that the semiautomatic handgun required a person to pull the trigger to fire each shot, and that each trigger pull required four pounds of pressure. *Id.* Several eyewitnesses testified about seeing the shooting, or hearing the shots. *Id.* at 15-17. One witness described petitioner as being pretty relaxed for having just shot someone. *Id.* at 16.

In his defense, petitioner admitted shooting Hood, claiming he thought Hood was going to kill him with the shovel. *Id.* at 17. Petitioner admitted drinking more than his usual amount, and described it as "past my limit" and "feeling it." *Id.* He said that when he left the bar Vause and Hood made racial comments about him, including using the N-word. *Id.* Petitioner testified that he was initially not angry and assumed they were drunk. When the two men tried to get into his car, however, he thought one had a knife. *Id.* at 18. Petitioner

said that he tried to look for the man who he thought had a knife, but the other man distracted him by yelling racist comments. *Id.* at 18-19. Petitioner said the man yelling racist comments then sprinted to the truck, grabbed a shovel, and threatened to hit him with the shovel. *Id.* at 19. Petitioner testified that he believed the man was going to kill him, but he did not remember pulling out or firing his gun and did not remember how many times he shot Hood. *Id.* Petitioner said the next thing he remembered was being home when the police arrived. *Id.* He testified that he did not tell the truth to detectives at first because he did not trust the police. *Id.* He presented a defense, supported by expert testimony, that post-traumatic stress resulting from the abuse he suffered as a child, as well as the violence he experienced in prison, affected his decision to shoot Hood. *Id.* at 19-20.

At the conclusion of the trial, the prosecution requested a jury instruction on the lesser included offense of manslaughter in the first degree. *Id.* at 20.[1] The jury found petitioner guilty of manslaughter in the first degree, and found he was armed with a firearm at the time he committed the crime. *Id.* at 21. The judge imposed a low-end standard range sentence of 78 months plus the mandatory 60-month firearm enhancement. *Id.*

II.    Procedural History

On direct appeal, the Washington State Court of Appeals held that the trial court erred by denying defense counsel's motion to suppress the evidence obtained at petitioner's house. Specifically, police did not have the authority to conduct a warrantless, protective sweep of petitioner's kitchen incident to his arrest, as petitioner was arrested on the front porch outside his

---

[1] Defense counsel objected that there was no evidence petitioner acted recklessly when he shot and killed Hood in self-defense. The trial court overruled the objection, reasoning that a jury could find he acted in self-defense, but because he fired three shots that was more force than is necessary and therefore he acted recklessly. *Id.* The court then instructed the jury to consider the lesser included offense of manslaughter in the first degree if they did not find beyond a reasonable doubt that petitioner committed murder in the second degree. *Id.* at 20-21.

REPORT AND RECOMMENDATION - 6

1    home.  Dkt. 14, Ex. 2 at 27-29.[2]  The Court of Appeals concluded, however, that absent the

2    evidence seized from the house, the "overwhelming untainted evidence leads to a finding of guilt

3    beyond a reasonable doubt and the jury verdict would have been the same absent the error."  *Id*.

4    at 30-31.[3]  The Court of Appeals denied petitioner's other assignments of error, and affirmed the

5    jury's verdict.  *Id*. at 46.

6         Petitioner sought review by the Washington Supreme Court.  Dkt. 14, Ex. 6.[4]  The

7    Washington Supreme Court denied review on May 31, 2017.  *Id*., Ex. 7 (*State v. Chambers*,

8    Supreme Court Cause No. 94166-1).  The Washington Court of Appeals issued the mandate on

9    June 23, 2017.  *Id*., Ex. 8.  Petitioner did not file a personal restraint petition.

10        Petitioner's habeas petition was filed on May 14, 2018, after he paid his filing fee,

11   presenting four grounds for federal habeas relief.  Dkt. 6.[5]  In the Answer, respondent points out

12   that petitioner has properly exhausted his available state court remedies as to his first two federal

13   habeas claims by fairly presenting those claims to the Washington Supreme court as federal

14   claims.  However, petitioner's third and fourth claims were never presented to the state courts as

15   federal claims, but only errors of state law.  Dkt. 13 at 8.  Respondent noted that Washington law

16   now bars petitioner from properly exhausting the two unexhausted claims.  *Id.*

17

18   _____

19        [2] After his arrest, the front door remained open and police could see that petitioner's spouse was sitting alone in the living room.  *Id*. at 27.  Thus, there was little concern that others in the house presented a danger.

20        [3] The court noted, for example, that petitioner testified that he acted in self-defense when he shot Hood with the Colt .45, he admitted that he had parked his BMW in front of the nearby pub on January 21, he kept a .45 caliber gun under the passenger seat of the BMW, and he used the Colt .45 to shoot Hood near the park.  Thus, the court

21   found that the improper seizure of the gun, magazine clip, and keys to the BMW did not change the outcome of the trial.  *Id*. at 28-29.

22        [4] Petitioner presented four issues to the Washington Supreme Court.  However, the first and fourth issues raised were only presented as state law claims, and not federal law claims.  Dkt. 14, Ex 6 at 12-21, 27-28.

23        [5] The undersigned issued a Report and Recommendation (R&R) recommending that petitioner's application to proceed *in forma pauperis* be denied, as he has the funds available to afford the $5.00 filing fee. While the R&R was pending, however, petitioner paid the filing fee, mooting the issue.  Dkt. 7.  The Honorable John C. Coughenour re-referred the case on May 18, 2018.  Dkt. 7.

REPORT AND RECOMMENDATION - 7

Petitioner conceded that his final two habeas claims were unexhausted, and sought leave

to file an amended petition deleting those two claims.  Dkt. 15.  Respondent had no objection to

the request, Dkt. 16, and the Court granted petitioner's motion.  On August 31, 2018, petitioner

filed his amended habeas petition, which now presents two grounds for federal habeas relief.[6]

Dkt. 20.

## II.   GROUNDS FOR FEDERAL HABEAS RELIEF

Petitioner identifies the following two grounds for habeas relief:

1.  Miranda Violation.  Incriminating statements used to convict Petitioner were
    obtained when police did not scrupulously honor Petitioner's repeated invocations
    of his right to remain silent.  The trial court's admission of those statements into
    evidence is contrary to established Supreme Court Law, as stated in *Miranda v.
    Arizona* and *Michigan v. Mosley*, and denied Petitioner Due Process of Law and
    violated rights guaranteed to him by the Fifth and Fourteenth Amendments to the
    United States Constitution.

2.  Denial of Right to Counsel.  Petitioner was denied his constitutional right to
    counsel, and to Due Process of Law, when he was unlawfully shackled and
    prevented from engaging in private and contemporaneous communication with
    his counsel during the deposition proceedings.  This state court decision was an
    unreasonable application of federal law, and it violated rights guaranteed to
    petitioner by the Fifth, Sixth, and Fourteenth Amendments to the United States
    Constitution.

Dkt. 20, Att. 1 at 2, 6.

## III.   DISCUSSION

### A.   Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

petition may be granted with respect to any claim adjudicated on the merits in state court only if

(1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court, or (2) the decision was based on an

---

[6] Respondent was not required to re-file its Answer, Dkt.13, which already responded to these two claims
on the merits.  On September 21, 2018, petitioner filed his reply to respondent's Answer.  Dkt. 21.

REPORT AND RECOMMENDATION - 8

1    unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

2    In considering claims pursuant to § 2254(d), the Court is limited to the record before the state

3    court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.

4    *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976,

5    993 (9th Cir. 2013).  "When more than one state court has adjudicated a claim, [the Court

6    analyzes] the last reasoned decision."  *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir.

7    2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

8         Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

9    only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

10   question of law, or if the state court decides a case differently than the Supreme Court has on a

11   set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

12   Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

13   the state court identifies the correct governing legal principle from the Supreme Court's

14   decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id*. at

15   407-09.  The Supreme Court has made clear that a state court's decision may be overturned only

16   if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

17   The Supreme Court has further explained that "[a] state court's determination that a claim lacks

18   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

19   correctness of the state court's decision."  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)

20   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

21        Clearly established federal law, for purposes of AEDPA, means "the governing legal

22   principle or principles set forth by the Supreme Court at the time the state court render[ed] its

23   decision."  *Lockyer*, 538 U.S. at 71-72.  This includes the Supreme Court's holdings, not its

1    dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the

2    legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary

3    to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d

4    952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

5          With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state

6    court's conclusion was based on "an unreasonable determination of the facts in light of the

7    evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

8    (quoting 28 U.S.C. § 2254(d)(2)); *see also Lockyer*, 538 U.S. at 75 ("The 'unreasonable

9    application' clause requires the state court decision to be more than incorrect or erroneous. The

10   state court's application of clearly established law must be objectively unreasonable."). The

11   Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the

12   presumption of correctness by clear and convincing evidence." *Miller-El*, 545 U.S. at 240

13   (quoting 28 U.S.C. § 2254(e)(1)).

14         With these standards in mind, the Court turns to petitioner's federal habeas claims.

15         *1.  Petitioner's Miranda Violation Claim (Ground 1)*

16              *(a)  Petitioner's Contentions*

17         Petitioner argues that the state courts erred by finding that enough time had passed

18   between his assertion of his right to remain silent, and the time when he ultimately agreed to talk

19   with the detectives about the shooting, that his right to maintain his silence was "scrupulously

20   honored." He acknowledges that when he was arrested on the front porch of his home at 10:49

21   PM on January 21, 2012, Seattle Police Officer Anthony Belgarde promptly read him his

22   *Miranda* rights at approximately 10:51 p.m., and he understood them. Dkt. 20-1 at 2; Dkt. 14,

23   Ex. 14 at 63 (trial transcript for January 13, 2014). When Officer Belgarde asked if he

1  understood his rights, petitioner indicated that he did.  Dkt. 14, Ex. 14 at 64. Officer Belgarde

2  then asked if petitioner wished to speak with police, and petitioner responded, "No."  *Id*. at 64-

3  65.[7]  Petitioner was transported to the Southwest Precinct and kept in a holding cell for

4  approximately one hour before homicide detectives transported him four or five miles to the

5  downtown Seattle Police Department headquarters.  Dkt. 14, Ex. 14 at 131-37, 142.  During both

6  trips, petitioner and the transporting officers did not converse or discuss what had transpired.  *Id*.

7  at 138.

8          Petitioner arrived at the downtown Seattle Police Department homicide office at 12:30

9  p.m.  Dkt. 14, Ex. 15 at 10 (January 14, 2014 trial transcript).  Detectives Steiger and Kasner

10  assumed custody and confined petitioner in interrogation room #1, where petitioner was held for

11  approximately three hours.  *Id*. at 11-16.  Detective Steiger testified that petitioner was held in

12  the room for this period of time because they were waiting for petitioner to sober up, and were

13  researching his criminal history.  *Id*. at 16.  Petitioner claims that during that time he was denied

14  access to telephone or restroom facilities, and was forced to urinate in a corner of the room.  Dkt.

15  20-1 at 3.  At 3:06 a.m., Detectives Steiger and Kasner entered the room and ordered petitioner

16  to stand for handcuffing, as they were taking him to Harborview Hospital for a blood draw.

17  During the drive, petitioner complained that his handcuffs were too tight and were causing him

18  pain, but his complaints were ignored.  Dkt. 20-1 at 3.  Petitioner claims that although Detective

19  Steiger knew that petitioner had been read his *Miranda* rights, he nevertheless attempted to ask

20  petitioner questions about the shooting during that drive.  Dkt. 20-1 at 3.  However, petitioner did

21

22          [7] When Officer Kyle Galbraith took custody of petitioner to transport him to the
    Southwest Precinct, he advised petitioner that he was being recorded by a camera in the patrol

23  car, to which petitioner responded, "F[] you."  Dkt. 14, Ex. 14 at 134.  Officer Galbraith testified
    this was the extent of their conversation, although petitioner occasionally chuckled during the
    drive.

1   not answer his questions, and said, "I don't want to talk about this."  Dkt. 20-1 at 3; Dkt. 14, Ex.

2   15 at 21-22.

3         Following the blood draw, the detectives escorted petitioner back to the car.  Dkt. 20-1 at

4   3.  At 3:55 a.m., Detective Steiger resumed efforts to interrogate petitioner.  He again read

5   petitioner his *Miranda* rights, and told petitioner he wished to hear petitioner's side of the story.

6   Dkt. 14, Ex. 15 at 27.  At that time, petitioner told Detective Steiger that he did not remember

7   what happened that night.  *Id*. at 28.  Petitioner claims that although he had "unequivocally

8   invoked the right to remain silent on 3 prior occasions, detectives still persisted and attempted to

9   interrogate him a fourth time."  Dkt. 20-1 at 3.  Petitioner claims that because it appeared that

10  "persistent badgering by the police would continue unabated," petitioner agreed to talk with the

11  detectives.  Dkt. 20-1 at 4.  Once they returned to the interrogation room from Harborview,

12  Detective Steiger confirmed on the record with petitioner that he had been advised of his

13  *Miranda* rights in the car, and yet again advised him of his rights.  Dkt. 14, Ex. 15 at 30.

14  Petitioner agreed to speak with detectives, and did not request a lawyer.  Dkt. 14, Ex. 15 at 62.

15  During the sixty minute interrogation that followed, petitioner made incriminating statements

16  which the State used to attack his credibility at trial. Dkt. 20-1 at 4.

17        Petitioner claims that his right to remain silent was violated when the same detectives

18  persisted in interrogating him twice within a forty-five minute period of time, both before and

19  after his trip into Harborview for the blood draw.  Dkt. 20-1 at 3.  Plaintiff's trial counsel moved

20  to preclude admission of petitioner's statements at trial on the basis that they were involuntary,

21  and that police had violated petitioner's *Miranda* rights by not scrupulously honoring his

22  invocations of his right to remain silent.  Dkt. 20-1 at 4. The trial court denied the motion on the

23  grounds that there was a knowing, voluntary and intelligent waiver, and that the detectives'

1   conduct fell within the requirements of *Mosley* because they had not made efforts to change

2   petitioner's mind about whether to talk.  In addition, the trial court found that significant time

3   passed between petitioner's assertion of his right to silence and the detectives' attempt to speak

4   with him.  Dkt. 20-1 (citing the trial court's conclusions of law 6, 7, 8, 15).

5        Petitioner argues that the trial court's conclusions are not sustainable under *Mosley* and

6   *Miranda*, as they are contrary to established federal law as determined by the U.S. Supreme

7   Court.  Dkt. 20-1 at 4.  In addition, petitioner claims that the state court misstated the record by

8   finding that police did not attempt to interrogate him during the trip to the Harborview Medical

9   Center.  *Id*. at 5.  Petitioner claims that the error was prejudicial, as the State played a recording

10  of the interrogation for jurors at trial which "shows petitioner misleading detectives about what

11  happened.  In a case that turned on Petitioner's credibility, evidence he was not truthful with law

12  enforcement shortly after the incident was prejudicial."  *Id.*

13           (b) *Legal Standard for* Miranda *Claims*

14       The Fifth Amendment provides that no person "shall be compelled in any criminal case to be

15  a witness against himself."  This privilege is applicable to the states through the Due Process Clause

16  of the Fourteenth Amendment.  *Malloy v. Hogan*, 378 U.S. 1 (1964).  To protect the right against

17  self-incrimination, the Supreme Court has established procedural safeguards that require police to

18  advise a person of the Fifth Amendment right prior to any custodial interrogation.  *Miranda v.*

19  *Arizona*, 384 U.S. 436 (1966); *Thompson v. Keohane*, 516 U.S. 99, 107 (1995);*Oregon v. Mathiason*,

20  429 U.S. 492, 495 (1977) (per curiam).

21       Prior to custodial interrogation, the police must advise the person of the right to remain silent

22  and of the right to request an attorney.  *Miranda*, 384 U.S. at 479.  If the suspect unequivocally

23  invokes the right to remain silent or requests counsel, the interrogation must cease.  *Id*. at 474.

    However, the police may interrogate the person, without the presence of an attorney, if the person

voluntarily, knowingly and intelligently waives the rights. *Id*. at 444.  The waiver may be expressed or implied.  *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  If the defendant speaks to the police and does not unambiguously indicate a desire to remain silent, the defendant has not invoked the right.  *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260-61 (2010) (a defendant who was "largely silent" during the hours long interrogation, but who finally admitted shooting the victims, had implicitly waived his right to remain silent). If the defendant unambiguously invokes the right to remain silent, the interrogation must cease. *Miranda*, 384 U.S. at 473-74.

However, while the particular interrogation must cease, the Supreme Court has not imposed a blanket prohibition on any further questioning by the police.  *Michigan v. Mosley*, 423 U.S. 96, 102-04 (1975).  A blanket rule that completely prohibits the police from subsequently questioning the defendant would lead to absurd results.  *Id*. at 102.  Instead of a blanket prohibition, the Supreme Court has established a rule that allows for further questioning if the police "scrupulously honor" the defendant's invocation of the right of silence.  *Mosley*, 423 U.S. at 103-04.  By allowing the defendant to terminate questioning, the defendant "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation."  *Id.*  Respecting the defendant's "exercise of that option counteracts the coercive pressures of the custodial setting."  *Id.* at 104.  Thus, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'"  *Id.*

(c) *The State Courts Reasonably Held that Petitioner Did Not Establish a Violation of his Rights Under* Miranda *and* Mosley

In a lengthy opinion, the Washington Court of Appeals concluded that the detectives did not violate petitioner's federal constitutional rights under *Miranda* and its progeny because they "scrupulously honored" petitioner's invocation of his right to remain silent:

Chambers contends the court erred in denying his motion to suppress the statements he made in the interview with Detective Steiger and Detective Kasner. Chambers asserts the detectives did not "scrupulously honor" his Fifth Amendment right to remain silent. U.S. CONST. amend. V.

The Fifth Amendment provides, in pertinent part, "No person shall be ... compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

In *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court adopted "[p]rocedural safeguards" to protect the privilege and held that before questioning an individual in custody, the police must clearly inform the suspect:

> [T]hat he has the right to remain silent, that anything he says
> can be used against him in a court of law, that he has the right
> to the presence of an attorney, and that if he cannot afford an
> attorney one will be appointed for him prior to any questioning
> if he so desires.

*Miranda*, 384 U.S. at 478-79.

The Court held that after warnings have been given, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. However, if a suspect in custody invokes his right to remain silent, law enforcement officers must cease interrogation. At that point, the suspect "has shown that he intends to exercise his Fifth Amendment privilege." *Miranda*, 384 U.S. at 473-74. "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Miranda*, 384 U.S. at 474.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L.Ed.2d 313 (1975), the Court addressed whether the decision in *Miranda* bars police from questioning a suspect after invocation of the right to remain silent. The Court held it did not.

> The *Miranda* opinion can[not] sensibly be read to create a per
> se proscription of indefinite duration upon any further
> questioning by any police officer on any subject, once the
> person in custody has indicated a desire to remain silent.

*Mosley,* 423 U.S. at 102-03.

The Court concludes a per se prohibition on further interrogation "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Mosley,* 423 U.S. at 102. The Court states that the intent of *Miranda* was to adopt a "'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored.'" *Mosley,* 423 U.S. at 103 (quoting *Miranda*, 384 U.S. at 479).

The Court reiterates the "critical safeguard" of *Miranda* is "a person's 'right to cut off questioning.'" *Mosley,* 423 U.S. at 103 (quoting *Miranda,* 384 U.S. at 474).

> Through the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

*Mosley,* 423 U.S. at 103-04.

> Therefore, the Court holds that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley,* 423 U.S. at 104 (quoting *Miranda,* 384 U.S. at 474, 478-79).

After reviewing "the circumstances leading to Mosley's confession," the Court concluded the police "'scrupulously honored'" his "'right to cut off questioning.'" *Mosley,* 423 U.S. at 104 (quoting *Miranda,* 384 U.S. at 474, 478-79). The police gave Mosley "full '*Miranda* warnings' . . . at the very outset of each interrogation" and "subjected him to only a brief period of initial questioning." *Mosley,* 423 U.S. at 106-07. After Mosley exercised his right to remain silent, the police "immediately ceased the interrogation." *Mosley,* 423 U.S. at 104. The police resumed questioning only after "the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Mosley,* 423 U.S. at 106. By contrast, the Court emphasized:

> This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.

*Mosley*, 423 U.S. at 105-06. [Washington Court of Appeal's footnote. Likewise, in *State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987), our Supreme Court held that in determining the validity of a waiver of a previously asserted right to remain silent, the court may consider as relevant factors:

> (1) [W]hether the right to cut off questioning was scrupulously honored; (2) whether the police engaged in further words or actions amounting to interrogation before obtaining a waiver; (3) whether the police engaged in tactics tending to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary.]

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the findings support the conclusions of law. *State v. Radcliffe*, 164 Wn.2d 900, 907, 194 P.3d 250 (2008); *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); *State v. Duncan*, 146 Wash.2d 166, 171, 43 P.3d 513 (2002).

Here, following the CrR 3.5 hearing and review of the videotaped interview, the trial court concluded the detectives scrupulously honored Chambers' right to remain silent; and Chambers "knowingly, voluntarily, and intelligently waived his rights" and agreed to talk to the detectives. The [trial court's] conclusions of law state, in pertinent part:

. . . . Pursuant to *Michigan v. Mosley*, . . . after a suspect asserts the right to remain silent, police may re-contact the suspect to see if he wants to talk if the original assertion of the right to remain silent is scrupulously honored. "Scrupulously honored" means the police must honor the request at the time it is made and must not persist in repeated efforts to get the defendant to talk. Here, at the time the detectives initiated conversation after leaving Harborview, defendant had twice been read his Miranda rights.... The defendant's statements made in the interview room are admissible because they were made voluntarily.
. . . .
. . . . Based on all the circumstances, the court finds that the defendant's statements to detectives are admissible because his assertions of his right to remain silent were scrupulously honored and ample time passed between his assertion and the police contacting him. [footnote omitted]

Chambers contends that contrary to *Mosley,* the court erred in concluding that "ample time passed" between the assertion of his Fifth Amendment right to remain silent and the questioning by detectives. Chambers asserts the time between when he made the unsolicited statement on the way to Harborview that "'I don't want to talk about this'" at approximately 3:07 a.m. and when Detective Steiger read *Miranda* rights to him and said he wanted to "hear [Chambers'] side of the story" at approximately 3:50 a.m. is not a significant period of time under *Mosley.* Chambers also notes that unlike in *Mosley,* police questioned him about the same crime. [footnote omitted]

But *Mosley* does not prescribe a bright line test to determine whether the right to cut off questioning was scrupulously honored. Although the Court in *Mosley* states two hours was a "significant period of time", the Court does not suggest a durational limit. *Mosley*, 423 U.S. at 106. [footnote omitted]. And the federal courts do not treat the nonexclusive factors the Court considered in *Mosley* as dispositive. *See, e.g.,* *United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998); *United States v. Andrade*, 135 F.3d 104, 106-07 (1st Cir. 1998); *Hatley v. Lockhart*, 990 F.2d 1070, 1074 (8th Cir. 1993); *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir.1988); *Jackson v. Dugger*, 837 F.2d 1469, 1471-72 (11th Cir. 1988): *United States v. Smith*, 608 F.2d 1011, 1014-15 (4th Cir. 1979): *Wilson v. Henderson*, 584 F.2d 1185, 1188-89 (2d Cir. 1978).

For example, in *Hsu*, the Ninth Circuit adopted an approach that considers all of the relevant factors with no one factor dispositive.  *Hsu*, 852 F.2d at 410.

*Mosley* envisioned an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. Among the factors to which the Court looked in that case were the amount of time that elapsed between interrogations, the provision of fresh warnings, the

REPORT AND RECOMMENDATION - 17

scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence. *See Mosley*, 423 U.S. at 104-06.... At no time, however, did the Court suggest that these factors were exhaustive, nor did it imply that a finding as to one of the enumerated factors—such as, for example, a finding that only a short period of time had elapsed—would forestall the more general inquiry into whether, in view of all relevant circumstances, the police "scrupulously honored" the right to cut off questioning.

*Hsu,* 852 F.2d at 410.

The touchstone of the analysis under *Mosley* is whether a "review of the Circumstances" leading up to the statements made to police show the " 'right to cut off questioning' was fully respected." *Mosley*, 423 U.S. at 104 (quoting *Miranda*, 384 U.S. at 474).

Here, the undisputed findings support the conclusion that the right to cut off questioning was scrupulously honored. Chambers was arrested at 10:49 p.m. and advised of his *Miranda* rights at 10:51 p.m. Chambers stated that he understood his rights. When Officer Belgarde asked Chambers if he wanted to speak to police, Chambers said, "[N]o." Officer Kyle Galbraith drove Chambers to the Southwest Precinct and then to Seattle Police Headquarters. "No questions were asked of the defendant during the trip from his home to the precinct, from the precinct to headquarters." The police placed Chambers in an interview room at Seattle Police Headquarters at approximately 12:28 a.m. "Upon entry into the room," Chambers was "taken out of handcuffs" and "accepted the officer's offer of a glass of water." He was "left alone in the interview room for about two-and-a-half hours." The police did not ask Chambers any questions while at police headquarters.

After obtaining a warrant to draw blood, Detective Steiger and Detective Kasner drove Chambers to Harborview for a blood draw at 3:07 a.m. Detective Steiger and Detective Kasner did not ask Chambers any questions during the trip to Harborview. But on the way, Chambers made the unsolicited statement that "'I don't want to talk about this.'"

After the blood draw, Chambers "appeared to have substantially sobered up." When they "reached the detective's car at 3:50 a.m.", Detective Steiger read Chambers his *Miranda* rights again. Chambers said he understood the rights and did not invoke his right to remain silent. While driving to the jail, Detective Steiger told Chambers that he "wanted to hear [Chambers'] side of the story." Chambers said, "'Man, I don't even remember what happened. I was just—I don't know what's going on. I don't remember anything that happened tonight.'"

When they arrived at the King County jail, Detective Steiger asked Chambers if he remembered what had happened that night. Chambers said he was trying to remember. Chambers then said, "'I don't know who this dude is. Do you have a picture of the dude? I need to see a picture of the guy.'" Detective Steiger said that he had a picture and "asked if they should go back to his office and have a talk." Chambers replied, "'Yeah, let's go.'" They left the jail and Detective Steiger and Detective Kasner drove Chambers to Seattle Police Headquarters. Before the recorded interview, the detectives read Chambers his *Miranda* rights. Chambers stated he understood his rights and agreed to talk to the detectives.

1

2

3

4

5

6

7

8

9

10

   Because the circumstances leading up to the interview show the police
scrupulously honored Chambers' right to cut off questioning, the court did not err in
denying the motion to suppress the statements Chambers made to Detective Steiger
and Detective Kasner.

   The record shows the police advised Chambers of his *Miranda* rights at 10:51
p.m. when he was arrested on January 21. Chambers stated he understood his rights
and unequivocally said he did not want to talk to the police. The record establishes
the police did not "ask the defendant any questions or persist in repeated efforts to
wear him down or change his mind after he invoked his rights." After he invoked his
right to remain silent at 10:51 p.m. on January 21, the police did not question
Chambers while at police headquarters. And while driving to Harborview to obtain a
blood draw at 3:07 a.m. on January 22, the detectives did not ask Chambers any
questions. Nonetheless, on the way to Harborview, Chambers said he did not want
to talk about what happened. While at Harborview, Chambers seemed to have
"sobered up." When they left Harborview approximately 45 minutes later,
Detective Steiger advised Chambers of his *Miranda* rights again. Chambers stated
he understood his rights and did not invoke the right to remain silent. We
conclude the undisputed facts support the conclusion that the right to cut off
questioning was scrupulously honored under *Mosley*.

11

Dkt. 14, Ex. 2, at 31-39.

12

Petitioner has not shown that the Washington Court of Appeals' resolution of petitioner's

13

claim is not contrary to, or an unreasonable application of, U.S. Supreme Court precedent such

14

as *Miranda* and *Mosley*. Even assuming that petitioner is correct, and the Washington State

15

Court of Appeals' erroneously found that the detectives did not attempt to question him during

16

the drive to Harborview Medical Center, petitioner's habeas claim still fails. Even if petitioner's

17

assertion that he did not want to discuss the shooting on the way to Harborview Medical Center

18

was not unsolicited, as the state court found, it is undisputed that the officers did not persist in

19

questioning petitioner further. Petitioner's right to cut off questioning was honored during that

20

trip. It was only after petitioner's blood draw, after the officers perceived that petitioner had

21

substantially sobered up, and after he had been formally advised of his *Miranda* rights a second

22

time, that the detectives told petitioner they were interested in hearing his side of the story.

23

Moreover, petitioner's incriminating statements about the events surrounding the shooting were

1  not made at the Seattle Police Headquarters until he had been formally advised of his *Miranda*

2  rights a third time.

3    As the state court correctly noted, the touchstone of the analysis under *Mosley* is whether a

4  "review of the circumstances" leading up to the statements made to police show that petitioner's right

5  to cut off questioning was fully respected.  *Mosley*, 423 U.S. at 104 (quoting *Miranda*, 384 U.S. at

6  474).  A review of the circumstances leading to petitioner's confession reveals that, regardless of

7  whether the detectives asked him any questions on the drive to Harborview, the detectives carefully

8  honored his right to cut off questioning at any point.  This was not a case where the detectives

9  persisted in repeated efforts to wear down petitioner's resistance.  Thus, there is no basis to conclude

10  that the state court erred by finding that the police "scrupulously honored" petitioner's invocation of

11  the right to remain silent, and the admission into evidence of petitioner's incriminating statements did

12  not violate the principles of *Miranda* or *Mosley*.  Petitioner's first federal habeas claim lacks merit,

13  as he has not shown that the state court adjudication of his claim was objectively unreasonable.

14    2.  *Petitioner's Denial of Right to Counsel Claim (Ground 2)*

15      (a)  *Petitioner's Contentions and the Relevant State Court Proceedings*

16    Petitioner contends that he was denied his constitutional right to counsel and due process

17  of law when he was shackled and prevented from engaging in private and contemporaneous

18  communication with his counsel during the deposition proceedings of prosecution witness Brian

19  Knight.  Dkt. 20-1 at 6.  Specifically, petitioner alleges that a perpetuation deposition of witness

20  Brian Knight, whose employment for the Department of Defense required him to be in Japan for

21  two months during petitioner's criminal trial, was scheduled for December 17, 2013.  Mr. Knight

22  was an independent witness to the shooting.  Although petitioner was able to attend the

23  deposition, he was shackled with leg-irons connected by a length of heavy chain, as well as a

waist chain with handcuffs.  Dkt. 20-1 at 6.  Although petitioner's trial counsel requested

REPORT AND RECOMMENDATION - 20

1   removal of the shackles, the jail guards declined to do so. Dkt. 14, Ex. 25 (January 31, 2014) at

2   6. Petitioner's counsel moved to have the issue of the shackling heard by the presiding judge,

3   Judge Hayden, arguing that petitioner would be unable to exercise his right of confrontation if he

4   remained shackled because he would not be able to review impeachment materials, discovery

5   materials, or take notes. *Id.* at 7.

6       Although the prosecution initially agreed with defense counsel's request to unshackle

7   petitioner, and the presiding judge even signed an agreed order to this effect, counsel for the

8   DAJD, Nancy Balin, subsequently objected to the order. *Id.* at 28, 48. At a hearing on the issue,

9   Ms. Balin argued that the basis for the jail's decision to use shackles on petitioner was not only

10  the pending murder charge, but historical information indicating a prior conviction for escape

11  with force when petitioner was a younger man. Dkt. 20-1 at 7, 28.

12      At the conclusion of the hearing, Judge Hayden declined to have petitioner released from

13  his restraints. Dkt. 14, Ex. 25 at 7. He ruled that petitioner's right to confrontation was not

14  jeopardized when the defendant was shackled during the perpetuation deposition when he is not

15  on camera, and he declined to overrule the jail's assessment of Mr. Chambers' safety risk. *Id.* at

16  49. He directed counsel to restrain him comfortably so that he was not restrained behind his

17  back, "give him a notepad, set him up so that he can take notes." *Id.* Petitioner argues that

18  because he was not physically present during this hearing, Judge Hayden could not observe the

19  actual manner of restraint imposed upon him, and appeared to be under the mistaken impression

20  that petitioner could still take notes with his shackles on. Dkt. 20-1 at 7.[8] When the deposition

21  resumed, the microphone at counsel table did not have a mute button. Petitioner contends this

22  

23  ─────────────────────

    [8] The trial transcript reflects that the reason petitioner was not present during this hearing was because the
    prosecutor and defense counsel had signed an agreed order to have petitioner unshackled, and therefore believed it
    would not be necessary to have petitioner present. However, after counsel for the jail opposed their request, the
    presiding judge declined to issue the order directing petitioner to be unshackled. Dkt. 14, Ex. 25 at 10.

1    had a chilling effect on communications between petitioner and his counsel, which was further

2    exacerbated by the fact that the shackles prevented petitioner from writing a note to his attorney.

3    Dkt. 20-1 at 8.

4        Defense counsel later moved to suppress the perpetuation deposition of Brian Knight

5    because petitioner's right to consult and access his counsel as well as his right to confront

6    witnesses against him under the Sixth Amendment was abridged.  The trial court assumed that

7    petitioner could not write in his shackles, despite the parties' disagreement on this point. *Id.* at

8    50-53.  However, even assuming that petitioner could not communicate with his counsel in

9    writing due to his restraints, the trial court held that other options were available to petitioner to

10   enable him to effectively communicate with his counsel.  First, petitioner could have taken a

11   recess to talk with his counsel at any time, given the fact that no jury was present and it was a

12   perpetuation deposition that could have been paused and then edited at a later date.  *Id.* at 54.[9]

13   Second, the parties could have identified the microphone problem at the outset of the deposition,

14   and either fixed the issue at the beginning or taken steps to cover the microphone in order to

15   effectuate communication between petitioner and his counsel.  *Id.* at 55.  Because other options

16   were available for petitioner to participate meaningfully in the perpetuation deposition, despite

17   his shackles, the trial court denied the motion to suppress.  *Id.*

18        The Washington Court of Appeals adopted the Washington Superior Court's conclusion

19   that petitioner was not denied assistance of counsel at the deposition.  Dkt. 14, Ex. 2 at 39-42.

20

21

22

23

---

[9] The trial noted that this would have been a sufficient remedy if petitioner had actually been informed of this option, although it is not clear that he was.

1    As a result, petitioner contends that the state courts' conclusion was contrary to clearly

2    established federal law, and is an unreasonable determination of the facts.[10]

3               (b) *Legal Standard Regarding Restraints During a Perpetuation Deposition*

4            The U.S. Supreme Court has long forbidden the routine use of visible restraints in the guilt

5    phase of a criminal trial.  *See Deck v. Missouri*, 544 U.S. 622, 626 (2005).  The Supreme Court has

6    allowed the compelled use of restraints visible to a jury only upon a showing of special need.  *Id.*

7    The Supreme Court has recognized the right to appear before the jury free of visible restraints

8    because of the adverse effect the restraints has on the presumption of innocence.  *Id.* at 626-29; *see*

9    *also Estelle v. Williams,* 425 U.S. 501, 503 (1976) (considering whether defendant's appearance

10   before jury in prison clothing violated due process); *Holbrook v. Flynn*, 475 U.S. 560, 562 (1986)

11   (considering whether visible courtroom security may infringe on the right to a fair trial).

12           Although a defendant may not be routinely compelled to appear before the jury in visible

13   restraints, the Supreme Court has never held that use of restraints during a perpetuation deposition,

14   conducted *outside the presence of the jury*, violates the Constitution by interfering with either the

15   defendant's right to confront witnesses against him or consult with counsel.  In fact, the Supreme

16   Court appears to recognize that other courtroom proceedings, outside the jury's presence, fall outside

17   the scope of the rule prohibiting visible restraints. *Deck*, 544 U.S. 626 ("Blackstone and other

18   English authorities recognized that the rule did not apply at 'the time of arraignment,' or like

19   proceedings before the judge.").

20           Similarly, while the Supreme Court has recognized that the use of visible restraints may

21   diminish the right to counsel by infringing on the defendant's ability to communicate with the

22   lawyer, the Supreme Court has recognized this fact only in cases where the defendant was visibly

23

---

[10] Petitioner alleges that in *Geders* and *Perry*, the Supreme Court held that the constitutional right to
counsel includes the opportunity for private and continual discussions between the defendant and his attorney during
the trial.

REPORT AND RECOMMENDATION - 23

(and in some cases totally bound and gagged) in front of a jury. *See Deck*, 544 U.S. at 631 (citing *Illinois v. Allen*, 397 U.S. 337 (1970)). The Supreme Court noted that the use of visible restraints might interfere with the defendant's ability to participate in his or her own defense by deterring the defendant from taking the stand to testy. *Deck*, 544 U.S. at 631. The Supreme Court, however, has not held that the use of nonvisible restraints interferes with the right to counsel, or violates the Constitution.

> (c) *The State Courts Reasonably Held that Petitioner Did Not Establish a Violation of his Federal Constitutional Rights By Virtue of Being Restrained During a Deposition*

As noted above, the Washington Court of Appeals affirmed the Superior Court's determination that the use of restraints during the perpetuation deposition did not violate petitioner's constitutional rights:

> The parties agreed to videotape the deposition of Knight and play the video at trial. The attorney representing the King County jail objected to removing Chambers' shackles during the deposition. The attorney argued that as a general rule, the jail does not remove shackles when a defendant is "outside the presence of the judge when it's not the actual trial." And because Chambers "is not the deponent", the jury would not know he was present. The attorney pointed out Chambers was charged with murder in the second degree and booking records showed he "has a history of escape by force and a history of kidnapping."

> Defense counsel argued that if Chambers was "in restraints he can't review the impeachment materials because he is not able to move his hands more than several inches away from his body", and "[h]e's not able to take notes in a meaningful way." But the jail sergeant confirmed Chambers would be wearing "[w]aste chains."

> The court ruled that Chambers could be restrained during the deposition as long as he could take notes and consult with counsel.

> He may be restrained if as long as he's not restrained behind his back you can restrain him comfortably, give him a notepad, set him up so that he can take notes. But, I'm not here to overrule the safety policies of the jail. Uh, and so long as he has his Constitutional Rights, and I suggest he does, as long as he's present personally um, then I will abide by the jail policies.

REPORT AND RECOMMENDATION - 24

Before trial, Chambers filed a motion to exclude the deposition testimony because the restraints "impeded consultation" with his attorney and violated his constitutional right to counsel. The State filed a response to the motion to exclude.

At the hearing, defense counsel and the prosecutor disagreed about whether Chambers could write and communicate with his attorney during the deposition. The defense argued the restraints prevented Chambers from writing and prevented him from speaking with his attorney without being recorded by the microphone located nearby. The prosecutor disagreed. The prosecutor stated the restraints did not prevent Chambers from writing and there were a number of actions the defense could have taken to resolve any issue with the microphone.

The only evidence presented at the hearing was a copy of the videotaped deposition. Chambers is not visible in the video.

The court ruled that "on this record", it could not resolve the factual dispute about Chambers' ability to write.

There is a factual dispute as to whether or not Mr. Chambers was able to write. [Defense counsel] proffers that [Chambers] could not write and [the prosecutor] says that it appeared that at least he could hold a tablet and I'm going to set this forward but frankly that's not a factual dispute that I can resolve on this record.

The court ruled the microphone on counsel table was "in the defense control."

[The microphone] is something that is in the defense control, the issue of the microphone and so I conclude that when the microphone — that the parties could have discussed it and they could have fixed the microphone issue at the beginning. It's nowhere discussed on the record, and it seems to me that they could have taken steps such as putting their hands over the microphone or done any number of things, and that would have effectuated communication between Mr. Chambers and his counsel.

The court denied the motion to exclude the videotaped deposition of Knight.

The trial court has broad discretion regarding the admission or exclusion of evidence. *State v. Swan*, 114 Wn.2d 613. 658. 790 P.2d 610 (1990). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A court abuses its discretion only when no reasonable person would take the view adopted by the trial court. *State v. Atsbeha*, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001).

1
2
3
4

    The court did not abuse its discretion in ruling the record was inadequate to determine whether the restraints interfered with Chambers' ability to consult with his attorney during the deposition. Chambers made no offer of proof and presented no evidence to support the assertion that he was unable to write or communicate with his attorneys. *See State v. Mee Hui Kim*, 134 Wn. App. 27, 42-43, 139 P.3d 354 (2006) (concluding court did not abuse its discretion in ruling on motion in limine where defendant presented no evidence to support the motion to exclude).

5
6
7

    And the court did not abuse its discretion by concluding defense counsel could have resolved any concerns about the microphone located near defense counsel. *See State v. Gonzales-Morales*, 138 Wn.2d 374, 386, 979 P.2d 826 (1999) (no abuse of discretion where defendant controlled the ability to communicate with his attorney).

8
9
10
11
12

    Chambers also claims the court erred in allowing the jail to use restraints. The trial court has broad discretion to determine what security measures are necessary. *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001). In determining whether the use of restraints is justified, the court considers a number of factors including the seriousness of the charge, the defendant's temperament and character, his age and physical attributes, his past record, and past attempted escapes. *Damon*, 144 Wn.2d at 691. The record shows the court's decision to allow restraints that allowed Chambers to take notes and consult with his attorney was not manifestly unreasonable or based on untenable grounds.

13
Dkt. 14, Ex. 2 at 39-42.

14
15
16
17
18
19
20
21
22
23

    As discussed above, although a defendant may not be routinely compelled to appear before the jury in visible restraints, the Supreme Court has never held that use of restraints during a perpetuation deposition, which is conducted *outside the presence of the jury*, violates the Constitution by interfering with either the defendant's right to confront witnesses against him or consult with counsel.  Moreover, petitioner presented no evidence to the state courts supporting his assertion that he was unable to write in his restraints, or take any of the other measures suggested by the trial court in order to effectively communicate with his counsel during the perpetuation deposition.  This case is clearly distinguishable from *Geders v. U.S.*, 4256 U.S. 80, 88 (1976), cited by petitioner, which involved the trial court's sequestration order preventing the witness/defendant from consulting with his trial counsel during an overnight recess that was seventeen hours long.  Although that case stands for the proposition that a defendant in a criminal proceeding is constitutionality entitled to

REPORT AND RECOMMENDATION - 26

communicate contemporaneously with his counsel, the state courts could reasonably conclude that this right was not abridged in this case, where there were alternative ways that defense counsel could have communicated with his client throughout the perpetuation deposition.

Because the U.S. Supreme Court has never held that the use of restraints, which are never shown to a jury, during a deposition violates the Constitution, and the state courts reasonably found that petitioner and his counsel could have taken steps to allow petitioner to effectively communicate with his counsel (and therefore effectively confront the witness) throughout the deposition, the state court adjudication of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court.

C.    Evidentiary hearing

Petitioner asks the Court to hold an evidentiary hearing.  Dkt. 20 at 15.  As discussed above, petitioner's federal habeas claims can be resolved by reference to the state court record. As a result, an evidentiary hearing is not necessary.  *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.").  Petitioner's request for an evidentiary hearing is therefore DENIED.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003).  Under this standard, the Court concludes that a certificate of appealability should be DENIED.

V.    CONCLUSION

The Court recommends petitioner's amended habeas petition, Dkt. 20, be DENIED without an evidentiary hearing, and this case be DISMISSED with prejudice.  The Court further recommends that a certificate of appealability be DENIED.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **January 3, 2019**.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 4, 2019.**

This Report and Recommendation is not an appealable order.  Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 13th day of December, 2018.

James P. Donohue
_____
JAMES P. DONOHUE
United States Magistrate Judge